SHERRY SULLIVAN,                    )
                                   )
                Plaintiff,          )
                                   )
v.                                 )    Docket no. 1:16-CV-310-GZS
                                   )
THE REPUBLIC OF CUBA,               )
A FOREIGN STATE,                    )
                                   )
                Defendant.          )


**ORDER ON PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

Before the Court is Plaintiff Sherry Sullivan's Motion for Default Judgment (ECF No. 13) in this action arising from the disappearance of her father. After careful consideration of her filings and the evidence presented, and for the foregoing reasons, the Court DENIES the Motion.


## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 21, 2016, Sherry Sullivan ("Sullivan") filed her Complaint with this Court seeking enforcement of a state court judgment against the Republic of Cuba ("Cuba"). The August 10, 2009 default judgment of the Maine Superior Court awarded Sullivan twenty-one million dollars ($21,000,000.00) in compensatory damages, plus pre- and post-judgment interest and costs, based on Cuba's "extrajudicial killing" of her father. As relevant to the matter before this Court, the state court made the following findings of fact: Geoffrey Francis Sullivan ("Geoffrey Sullivan") was an American citizen and the father of Sherry Sullivan, an American citizen, who "was, is and/or will be duly appointed as the successor to, heir to and guardian of her father's estate." (Superior Court Judgment (ECF No. 1-3), PageID # 18.) Cuba is a foreign state that, at the time

of the proceeding in the state court, had been designated a state sponsor of terrorism. Geoffrey Sullivan served in the United States Air Force and Army National Guard and was a licensed small aircraft pilot. In the National Guard, Geoffrey Sullivan met Alexander Rorke, Jr. From 1960 until their disappearance around October 1963, Geoffrey Sullivan and Rorke participated in various covert missions in Cuba and Central America against the Cuban government of Fidel Castro, such as the bombing of an oil refinery in Havana. In the fall of 1963, Geoffrey Sullivan and Rorke flew a twin-engine airplane from Florida with the purported destination of Honduras to engage in commercial "lobster hauling." However, they actually flew to several places in Mexico.[1] On October 1, 1963, Geoffrey Sullivan and Rorke flew to Cozumel, Mexico, and then on to a further unknown location. The state court described the evidence about what then happened to Geoffrey Sullivan as follows:

> Evidence has been uncovered which has revealed that Mr. Sullivan was shot down over Cuba in the course of a covert mission against the Castro regime and was and had been imprisoned by the Castro regime in Cuba, without disclosure of same, in violation of international law, thereafter. That evidence includes, among other information, specifically, (1) reports contemporaneous to the October 1, 1963 disappearance from a variety of sources which stated that Rorke and Sullivan had been shot down and that two Caucasians fitting the description of Rorke and Sullivan had been taken aboard a Cuban sea-going vessel; (2) United States Department of State records dating from November, 1963 which detail 'rumors emanating from Cuban refugees that Rorke and Sullivan reportedly crashed in Cuba and that either Rorke or Sullivan was killed, but one of them was alive;' (3) in 1969, Americans who had been formerly incarcerated in Cuba reported that the 'Sullivan' name was familiar from detainments at both the G-2 military police headquarters in Havana, Cuba and the Marone Prison for Political prisoners; (4) in 1972, a private American pilot detained in Cuba on unrelated charges reported that he had been detained adjacent to a Caucasian American who claimed to be Mr. Sullivan and claimed to then having been detained for 'almost ten years'; (5) a 1989 Miami, Florida newspaper article on the Rorke/Sullivan disappearance prompted a report to a radio talk-show program from a Cuban émigré that Rorke and Sullivan [had been] shot down 'during combat' with a Cuban aircraft 'belonging to the [Cuban] Ministry of Light Industry, Commandant Ernesto "Che" Guevara' . . . and that '[T]he [Cuban] Ministry of the Armed Forces and the Ministry of the Interior have in their possession the registration number, day, hour and place in which this

---

[1] As described below, they might have also passed through British Honduras (now Belize).

account took place. The [American] airplane was taking action of sabotage against the sugar cane industry of Cuba . . .'; (6) in 1989, a Cuban émigré formerly imprisoned at the 'Combinado del Este' prison in Cuba related that he had advised the FBI and CIA years prior that a (badly burned) American had been at the prison hospital there contemporaneous with the period immediately following the Rorke/Sullivan disappearance; and (7) in 1991, two separate Cuban-Americans who themselves had been imprisoned at the 'Combinado del Este' prison at various times reported the presence there of a Caucasian prisoner named 'Sullivan'.

(Superior Court Judgment, PageID #s 20-21.)

The state court further found that, after his 1963 disappearance, Geoffrey Sullivan had been declared legally dead by the United States Social Security Administration and by a proclamation of the Maine State Legislature.[2]  Finally, the state court found that Cuba "has intentionally, unlawfully, and with complete disregard for human life caused the indeterminate, undisclosed and illegal incarceration of Mr. Sullivan, which incarceration has culminated in the legally-declared death of Mr. Sullivan and which constitutes an extrajudicial killing under applicable law." (Superior Court Judgment, PageID # 21.)

Given these findings, the state court determined it had subject matter jurisdiction pursuant to the terrorism exception of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, which, in relevant part, provides federal and state courts with jurisdiction over suits against certain foreign states based on any "extrajudicial killing" carried out or supported by those foreign states.  Based on Cuba's default in the state suit and the state court's conclusion that "[t]he indeterminate, undisclosed and illegal incarceration of Mr. Sullivan, which incarceration has culminated in [his] legally-declared death . . . constitutes an extrajudicial killing," the state court concluded that Cuba was liable to Sherry Sullivan for her father's death.[3]  (See Superior Court Judgment, PageID #s

---

[2] Geoffrey Sullivan was born in 1934, so he would be 82 or 83 years old today if still alive.

[3] The state court, however, dismissed the claims against Fidel Castro, Raúl Castro, and the Army of the Republic of Cuba without prejudice because these defendants had not been properly served.  (Superior Court Judgment (ECF No. 1-3), PageID # 26.)

25, 26.)  The state court also determined that it had subject matter jurisdiction "pursuant to Maine state law . . . because Plaintiff seeks damages for wrongful death" and that the court had personal jurisdiction over Cuba in part based on "Maine's long-arm statute." (Superior Court Judgment, PageID # 25.)

Regarding the assessment of damages, the court found that Sullivan "has devoted her life to uncovering the truth respecting her father"—including by contacting "dozens of Federal agencies and officials" and pursuing an action under the Freedom of Information Act (FOIA)— and that the uncertainty over her father's fate has "devastated her life." (Superior Court Judgment, PageID # 23-24.)  The court ultimately awarded damages to Sullivan based upon, "(a) The loss of support and services suffered and to be suffered by Sherry Sullivan as a result of her father's wrongful death; (b) The severe emotional distress and anguish suffered by Sherry Sullivan, which she will continue to suffer as a result of her father's wrongful death; (c) The loss of net accumulations and sustained economic damages owed to the Estate of Geoffrey Francis Sullivan; and (d) Damages for pain and suffering prior to death owed to [the estate of] Geoffrey Francis Sullivan." (Superior Court Judgment, PageID #s 26-27.)

In her Complaint before this Court, Sullivan alleges, "[t]o date, [she] has not collected any amount of the Final Judgment entered in [her] favor by the Maine State Court on August 10, 2009. Thus, the entire amount of the Final Judgment, plus pre- and post-judgment interest, remains due." (Compl. (ECF No. 1) ¶ 14.)  On May 12, 2017, Sullivan moved for entry of a default against Cuba based on the fact that Cuba had been properly served but had failed to enter an appearance in the present matter.  (ECF No. 11.)  On May 15, 2017, this Court directed the clerk to enter a default against Cuba pursuant to Federal Rule of Civil Procedure 55(a) but requested Sullivan address some areas of concern to this Court in any motion for default judgment, specifically,

(1) The extent to which this Court should consider whether the state court had subject matter jurisdiction in the original action;

(2) The asserted basis for Cuba's waiver of sovereign immunity given that the state court judgment does not clearly find that the extrajudicial killing occurred after Cuba was added to the State Sponsors of Terrorism List or that Cuba was added to the list as a result of the killing . . . ; and

(3) Whether the Court need hold a separate evidentiary hearing or otherwise take additional evidence in light of its obligations to review the basis for a default judgment pursuant to 28 U.S.C. § 1608(e) and Federal Rule of Civil Procedure 55.

(Order on Motion for Entry of Default and Procedural Order (ECF No. 12), PageID #s 64-65 (footnote omitted).)

On June 12, 2017, Sullivan filed a Motion for Default Judgment in which she addressed the Court's questions. Regarding the state court's jurisdiction, Sullivan noted that the state court determined it had subject matter jurisdiction based on the terrorism exception to the Foreign Sovereign Immunities Act and stated that "[t]he [state] court came to [its] Conclusion of Law based on pleadings and testimony given by Plaintiff Sullivan showing that Geoffrey Sullivan was deceased sometime after 1982, when Cuba was designated as a state sponsor of terrorism." (Motion for Default Judgment (ECF No. 13), PageID # 67.) Regarding the necessity of an evidentiary hearing, Sullivan argued that

[t]he state[] [court's] . . . implicit determination based on testimony and documentation submitted by the plaintiff that the killing occurred after 1982, which findings should be accepted by this Court, together with the . . . further-provided information, is sufficient to resolve [the Court's concern]. It is respectfully submitted that this Court—in the exercise of its obligation to review the basis for the requested default judgment—need not second-guess the state court in its findings.

(Motion for Default Judgment, PageID #s 69-70.)

Sullivan attached to her Motion an unsigned affidavit by counsel David Van Dyke stating, in relevant part, that "after due inquiry, neither a transcript nor an audio-recording of the June 4, 2009 hearing [in state court] can be obtained"; that "[t]o the best of my recollection, the final

default damages hearing lasted approximately 90 minutes" and that "Ms. Sullivan testified for virtually the entire" hearing; and that "[a]t [the] conclusion of the hearing, [the state court judge] raised to the undersigned a series of pointed inquiries regarding subject matter jurisdiction and the circumstances of service." (Aff. of David J. Van Dyke, Esq. (ECF No. 13-1), PageID #s 71-72.) Sullivan also attached to her Motion an unsigned affidavit in which she attests to knowledge of two specific "eyewitness observations of [her] father being alive [in a Cuban prison] at least through 198[2], the latter of which places [her] father still alive in prison in Cuba as of 1991." (Aff. of Sherry Sullivan (ECF No. 13-3), PageID # 77.) She claims that she did not provide the state court with "specific details" of these eyewitness accounts because the source of both accounts was afraid of potential retaliation by Cuban agents, but that she was providing the information now "given the passage of time since 2009 and insofar as it appears that the federal court is seeking further and specific details supporting the fact of [her] father's extra-judicial killing by Cuba after Cuba was added to the list of state sponsors of terror in 1982." (Aff. of Sherry Sullivan, PageID # 76.) Finally, Sullivan attached to her affidavit a series of notes regarding these eyewitness accounts seemingly compiled by research staff of the "Unsolved Mysteries" television show. (Attachment A to Sullivan Aff. (ECF No. 14), PageID #s 79-82.)

On July 26, 2017, after setting a hearing on the Motion for Default Judgment, this Court issued a procedural order directing counsel to "be prepared to address the issues raised in the Court's May 15, 2017 Order, as well as, in general, the basis for the state court's jurisdiction." (Procedural Order Regarding Motion for Entry of Default Judgment (ECF No. 16), PageID # 83.) At the August 28, 2017 hearing on the Motion for Default Judgment, Sullivan presented testimony from two witnesses. Attorney William Oldaker testified that Sullivan is seeking enforcement of the state court judgment in federal court so that she can pursue compensation through a dedicated

fund to compensate claimants who have a final judgment issued by a federal district court against a state sponsor of terrorism. See Justice for United States Victims of State Sponsored Terrorism Act, 34 U.S.C. § 20144 (formerly 42 U.S.C. § 10609). Sullivan then testified for the bulk of the hearing and described (1) the evidence she had compiled suggesting that her father was imprisoned in Cuba into the early 1990s; (2) her longstanding efforts to access more information on his fate; and (3) the extreme emotional pain and economic hardship she had suffered after her father disappeared when she was a young child.

Specifically, regarding her father's fate, Sullivan testified that her mother was told by the State Department soon after the disappearance that her father and Rorke were in a Cuban prison. She described her quest to find out information about her father as an adult and testified that she had compiled information based on interviews she had conducted and voluminous documents she had received from FOIA requests, including documents that had been heavily redacted by the United States government. She also testified regarding the most recent eyewitness account of her father in a Cuban prison: after the airing of an episode of "Unsolved Mysteries" discussing her father's case, she had been contacted by a man in Florida, Stephen Scherer, who had provided her information he had received from a security guard at his workplace, Carlos Kersey, who claimed to have seen her father in a Cuban prison in the 1970s and knew another person who had seen her father in prison in the early 1990s.

Sullivan also presented several exhibits to the Court, including:

- Documents that appear to be summaries of notes and research drafted by Sullivan based on her interviews and document reviews, and which relate to her father's involvement with Rorke in anti-Castro activities, perhaps with the clandestine support of the U.S. government, and his disappearance in early October 1963. (Hr'g Exs. 1-3.)

- What appears to be a letter written by Sullivan's mother, Cora Sullivan, which seemingly describes her receipt of information that Geoffrey Sullivan's plane crashed and that he was in a Cuban prison. (Hr'g Ex. 5.)[4]

- Contemporaneous newspaper articles about her father's disappearance. (Hr'g Ex. 11.)

- A 1969 document seemingly from a Social Security Administration reconsideration case stating, "we are now prepared to find that the evidence would . . . establish that Mr. Sullivan died on September 24, 1963." (Hr'g Ex. 12.)

- A photo of a grave marker for Geoffrey Sullivan chiseled with "MIA 1963." (Hr'g Ex. 13.)

- Documents compiling second or third-hand reports of sightings of Geoffrey Sullivan in Cuban prisons, including various tips seemingly compiled by Sullivan and, again, the notes compiled by researchers at "Unsolved Mysteries." (Hr'g Exs. 16, 17.) Several entries involve the report to Sullivan by Stephen Scherer that Carlos Kersey had told him he had seen two Caucasians, including an "American pilot," in a Cuban prison in 1978. (Hr'g Ex. 17, p. 21.) The entries regarding the information from Scherer describe that a "friend" of Kersey's "released [from Combinado del Este prison] later in 1991 . . . said the 2 men still there." (Hr'g Ex. 17, p. 22.) The entries further describe that a "relative" of Kersey's was in the Combinado del Este prison as of 1994 and that "[t]hey will try to ask him" if the two men are still there. (Hr'g Ex. 17, p. 22.) The entries do not document any report from this relative, and it is not entirely clear whether Sullivan's testimony at the hearing about the most recent sighting of her father was based on a subsequent report from this relative, a report from Kersey's "friend," or both. It is also not entirely clear whether Sullivan or her investigators ever spoke directly with Carlos Kersey or his contacts.

- A sworn affidavit by Stephen Scherer, dated August 23, 2017, and stating in relevant part: "While employed by Smith Barney I had a conversation with our security guard, Carlos Kersey [who told him that] [w]hile in [a] Cuban prison he saw many Americans who were also incarcerated with him. . . . All of the Americans were there for drug related charges and all of the Americans that he saw were black, EXCEPT ONE. . . . The one white American was not charged with drug related crimes and claimed to be a private pilot. . . . The information provided by Carlos matches the information on an episode of 'Unsolved Mysteries.'" (Hr'g Ex. 19.)[5]

---

[4] In this exhibit, which is difficult to read, Cora Sullivan appears to write about Geoffrey Sullivan's disappearance, but also mentions that "Geoff called again today from Puerto Rico." (Hr'g Ex. 5, p. 3.) For this reason, the Court suspects that the exhibit merges at least two letters written by Cora Sullivan around the time of the disappearance. At the August 28, 2017 hearing, Sherry Sullivan testified that Cora and Geoffrey were legally divorced at the time of the disappearance.

[5] Other exhibits submitted to this Court at the hearing include materials created by a young Sherry Sullivan demonstrating her pain over her father's disappearance and her assumption that he was in prison and documents discussing U.S. government support for covert anti-Castro operations. (Hr'g Exs. 6, 9, 10.)

At the conclusion of the hearing, the Court asked Sullivan to provide it with any relevant documents referred to in the compilations of notes regarding Geoffrey Sullivan's disappearance and whereabouts. The Court also expressed concern about the possibility that Sullivan was not a legal representative of her father's estate and asked Sullivan to brief this issue.

On September 15, 2017, Sullivan submitted a post-hearing brief and additional exhibits. (ECF Nos. 20, 21.) The additional exhibits include:

- Various documents regarding the disappearance of Geoffrey Sullivan and Rorke's plane. A heavily redacted document on FBI letterhead from 1964 states that "ALEXANDER I. RORKE, Jr. and GEOFFREY SULLIVAN, [were] aboard [an] airplane which has been missing since 9/63, and [are] dead" and that their "flight did not reach its destination and it is presumed by various individuals the flight crashed and all aboard, [REDACTED] were killed. (ECF No. 21-2, PageID # 119.) A document that appears to be on United States Department of State letterhead states that Rorke and Geoffrey Sullivan "American Soldiers of Fortune, who have been involved in various Cuban exile ventures against Cuba[,]. . . have not been heard from since" departing Cozumel but that "[t]here have been several rumors emanating from Cuban refugees that Rorke and Sullivan reportedly crashed in Cuba and that either Rorke or Sullivan was killed, but one of them [is] alive." (ECF No. 21-2, PageID # 120.) A barely legible document of uncertain date, described by Sullivan as "FAA report (poor legibility)," appears to state that a military source believed that "Rorke and the aircraft were probably in Cuba[,] either shot down or forced down." (ECF No. 21-2, PageID # 121.) Another document, which Sullivan identifies as an "FBI report" but which appears to be a version of a United Press International wire story, again states that "[t]her[e] was speculation among Cuban exile sources here [that] the men might have flown over Cuba and been forced down." (See ECF No. 21-2, PageID #s 122, 123.) Finally, another newspaper article provides the bare facts of the two men's disappearance while linking them to the "anti-Castro movement." (ECF No. 21-2, PageID # 124.)

- A document "[c]ompiled by Sherry Sullivan September 12, 2017," which summarizes various reports of her father's whereabouts after his disappearance. (ECF No. 21-3, PageID # 125.) Attached to this summary document is a "report," perhaps authored by Sullivan, describing a conversation with a certain Marty Casey in which he describes meeting a Cuban who told Casey he had seen a man who the Cuban believed to be Geoffrey Sullivan in a Cuban prison in 1963. (ECF No. 21-3, PageID #s 126-27.) Also attached is an unsworn affidavit by an Edith Kermit Roosevelt attesting that "[s]ometime during the mid sixties (1960's), I was told by the Cuban Desk at the United States Department of State . . . that both Alexander Rorke and Geoffrey Sullivan were dead, and that their bodies were in Cuba. . . . I was told that their plane was shot down over Cuba." (ECF No. 21-3, PageID

# 128.)[6]  Finally, a heavily marked-up document of unclear authorship relates that Rorke and Geoffrey Sullivan actually landed in Belize after leaving Cozumel, where they crossed paths with an American commercial pilot, Floyd Park.  The document goes on to relate that Park later received information that two men fitting their description were forced to board a Cuban fishing boat in Belize or Honduras.  (ECF No. 21-3, PageID # 131.)

- A summary of conversations between Floyd Park and Sullivan, an attorney, and a private investigator.  (ECF No. 21-4.)  According to the summary, Park had received information that Rorke and Geoffrey Sullivan may have been forced onto a Cuban fishing boat in Honduras, but he also stated it "was a slim possibility" that their plane had simply crashed at sea.  (ECF No. 21-4, PageID #s 133, 136.)[7]

In her post-hearing brief, Sullivan did not supply the court with any documentation that she is or was ever appointed legal representative of her father's estate or any documentation supporting her claim that she is her father's sole heir.[8]

## II.   LEGAL BACKGROUND

The Foreign Sovereign Immunities Act (FSIA), which declares that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided" by certain statutory exceptions, 28 U.S.C. § 1604, "provides the sole basis for obtaining jurisdiction over a foreign state" in a domestic court, <u>Argentine Republic v. Amerada Hess Shipping Corp.</u>, 488 U.S. 428, 439 (1989).  Pursuant to the section entitled "Terrorism exception to the jurisdictional immunity of a foreign state,"

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which

---

[6] The Court notes that this Roosevelt is likely the granddaughter of the Edith Kermit Roosevelt who was married to President Theodore Roosevelt and died in 1948.

[7] Sullivan also submitted to the Court several almost completely redacted documents (ECF No. 21-4) and materials from the "Unsolved Mysteries" program that she had already provided (ECF No. 21-5).  The Court is unable to locate a "Frank Nelson statement" that Sullivan mentions in her index of the supplemental exhibits.  (<u>See</u> ECF No. 21, PageID # 117.)

[8] There are several small discrepancies between the evidence presented to this Court and the state court's characterization of the evidence of Geoffrey Sullivan's whereabouts after his disappearance (<u>see</u> Superior Court Judgment, PageID #s 20-21), but these discrepancies are not material to the Court's disposition of the present matter.

money damages are sought against a foreign state *for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking*, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1) (emphasis added).[9]  A court shall hear a claim under the terrorism exception if "the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred [torture, extrajudicial killing, etc.], or was so designated as a result of such act, and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section."  Id. § 1605A(a)(2)(A)(i)(I).  Cuba was designated as a state sponsor of terrorism in 1982.[10]  Mark P. Sullivan, Cong. Research Serv., RL32251, Cuba and the State Sponsors of Terrorism List 3 (2006) (describing Cuba's placement on the list).  In addition, for such a claim to be heard, "the claimant or the victim" must have been "at the time the act described in paragraph (1) occurred—(I) a national of the United States; (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment."  28 U.S.C. § 1605A(a)(2)(A)(ii).  Relatedly, the terrorism exception provides that a foreign state "shall be liable to—(1) a national of the United States, (2) a member of the armed forces, (3) an employee

---

[9] It appears that Sullivan referred to 28 U.S.C. § 1605(a)(7) before the state court, but that section was repealed and replaced with Section 1605A in 2008.  Owens v. Republic of Sudan, 864 F.3d 751, 765 (D.C. Cir. 2017).  Readers interested in the prehistory of Section 1605A are directed to the D.C. Circuit's Owens opinion.  Id. at 763-65.

[10] Cuba was removed from the list of state sponsors of terrorism in 2015, but Cuba was on the list at the time Sullivan's claim was filed in state court.  Sullivan does not appear to argue that Cuba was designated a state sponsor of terrorism because of its treatment of her father, and she recognizes that Cuba was designated based on its unrelated "support for acts of international terrorism."  (Motion for Default Judgment (ECF No. 13), PageID # 68.)  Cuba was in fact added to the state sponsors of terrorism list based on its material support for guerilla groups in Central and South America who engaged in terrorist operations.  Mark P. Sullivan, Cong. Research Serv., RL32251, Cuba and the State Sponsors of Terrorism List 3-5 (2006).

of the Government of the United States . . . or (4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts . . . for which the courts of the United States may maintain jurisdiction under this section for money damages."  Id. § 1605A(c).  "[D]amages may include economic damages, solatium [emotional injury], pain and suffering, and punitive damages."  Id.  If the act at issue occurred in the foreign state, the claimant must have "afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration."  Id. § 1605A(a)(2)(A)(iii).  Finally, if an action was not brought before the enactment of Section 1605A in 2008, the action must be brought "not later than the latter of—(1) 10 years after April 24, 1996; or (2) 10 years after the date on which the cause of action arose."  Id. § 1605A(b).

In the context of the terrorism exception, the term "extrajudicial killing" has the meaning given the term in the Torture Victim Protection Act of 1991.  28 U.S.C. § 1605A(h)(7).  The Act defines "extrajudicial killing" as

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).  In general, the meaning of "extrajudicial killing" is "closely align[ed] . . . with the prevailing meaning of 'summary execution' under international law."  Flanagan v. Islamic Republic of Iran, 190 F. Supp. 3d 138, 161 (D.D.C. 2016).  Something as informal as a rock-throwing incident can meet the definition of an extrajudicial killing, see Shoham v. Islamic Republic of Iran, Civil No. 12-cv-508 (RCL), 2017 WL 2399454, at *12 (D.D.C. June 1, 2017), but there must be some evidence that the foreign sovereign, or someone it materially supported,

"killed" the victim and did so "outside the formal legal process," that is, "without due process,"

Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1050-51 (D.C. Cir. 2014).

There is no showing of an "extrajudicial killing" where plaintiffs "allege no facts showing that the

deaths [at issue] met the minimal requirement for extrajudicial killing—that is, that [the] deaths

were 'deliberate' in the sense of being undertaken with studied consideration and purpose" and

where the pleaded facts allow for "alternative explanations," such as negligence or accident.

Mamani v. Berzain, 654 F.3d 1148, 1155 (11th Cir. 2011).[11]

Ordinarily, when a party is properly served and fails to appear, a default judgment for a

sum certain may be entered against that party as a matter of course. See Fed. R. Civ. P. 55(b)(1).

However, an attempt to seek a default judgment in an action involving a foreign sovereign triggers

a special duty on the part of a federal court to carefully scrutinize the plaintiff's claim. Courts

always have an "independent obligation to consider the presence or absence of subject matter

jurisdiction *sua sponte*." Walters v. Indus. & Commercial Bank of China, Ltd., 651 F.3d 280, 287

(2d Cir. 2011) (quotation marks omitted). A federal court's subject matter jurisdiction in an action

against a foreign sovereign is premised on Section 1330(a), which provides:

> The district courts shall have original jurisdiction without regard to amount in
> controversy of any nonjury civil action against a foreign state as defined in section
> 1603(a) of this title as to any claim for relief in personam *with respect to which the*
> *foreign state is not entitled to immunity either under sections 1605-1607 of this title*
> or under any applicable international agreement.

28 U.S.C. § 1330(a) (emphasis added). Section 1330 is the basis for a federal court's jurisdiction

over a foreign sovereign even when the court is being asked to enforce a state court judgment

---

[11] Courts have described the terrorism exception as only requiring that a victim's injury or death have been proximately caused by the foreign state's actions. See Worley v. Islamic Republic of Iran, 75 F. Supp. 3d 311, 325 (D.D.C. 2014). The Court notes, however, that the question of whether a victim's injury or death was proximately caused by a foreign state's actions is less relevant in the context of an alleged extrajudicial killing by the foreign state because "extrajudicial killing" by definition requires intentionality and deliberation on the foreign state's part.

because "an attempt to obtain a federal judgment on the strength of a state court judgment is not a case arising under the Constitution, laws, or treaties of the United States that would trigger federal question jurisdiction."  Vera v. Republic of Cuba, 867 F.3d 310, 320 (2d Cir. 2017).  Therefore, when asked to enforce a state court judgment against a foreign sovereign based on the terrorism exception to foreign sovereign immunity, a federal court must examine whether the claim actually falls within that exception.  This obligation to determine jurisdiction cannot be abrogated by a party's default because it is axiomatic that "federal courts are powerless to act in the absence of subject matter jurisdiction."  Espinal-Dominguez v. Commonwealth of Puerto Rico, 352 F.3d 490, 495 (1st Cir. 2003).

Furthermore, when a federal court is asked to enforce a default judgment, the federal court is not bound by the judgment court's determination of jurisdiction.  Cf. Jerez v. Republic of Cuba, 775 F.3d 419, 422 (D.C. Cir. 2014) ("[A] court asked to enforce a default judgment must entertain an attack on the jurisdiction of the court that issued the judgment.").  In fact, a state court judgment is not entitled to full faith and credit if the state court did not have jurisdiction to enter the judgment. See V.L. v. E.L., 136 S. Ct. 1017, 1020 (2016) (noting that full faith and credit need not be afforded "to a judgment rendered by a court that did not have jurisdiction over the subject matter") (quotation marks omitted); Wiederspan v. Republic of Cuba, 15-CV-1983 (VEC), 2017 WL 1102674, at *2 (S.D.N.Y. Mar. 23, 2017) (explaining that before giving a state court judgment full faith and credit, a federal court must determine whether the state court had jurisdiction).  This principle follows from the fact that a federal court must treat a state court judgment as it would be treated in the rendering state.[12]  See 28 U.S.C. § 1738 ("Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every

---

[12] Under Maine law, a judgment rendered in the absence of jurisdiction is void.  Hawley v. Murphy, 736 A.2d 268, 271 (Me. 1999).

court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."); Wiederspan, 2017 WL 1102674, at *2.

In addition to a court's obligation to ensure it has subject matter jurisdiction, the FSIA provides,

> No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.

28 U.S.C. § 1608(e). As the D.C. Circuit has commented, "[p]recisely what that [evidence satisfactory to the court] standard entails—that is, how much and what kind of evidence the default provision requires—is unclear." Han Kim, 774 F.3d at 1046. However, circuit courts have provided some guidance. In general, the Section 1608(e) standard "mirrors a provision in Federal Rule of Civil Procedure 55(d) governing default judgments against the U.S. Government." Owens v. Republic of Sudan, 864 F.3d 751, 785 (D.C. Cir. 2017); see Fed. R. Civ. P. 55(d) ("A default judgment may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfies the court.") The Rule 55(d) standard itself requires a district court to "determine whether the plaintiff's allegations are supported by evidence," but does not require an evidentiary hearing. Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 242 (2d Cir. 1994).

In the context of Section 1608(e), the determination of whether a plaintiff's allegations are supported by evidence has sometimes been framed as a determination of whether the plaintiff has made out a prima facie case. See, e.g., Lasheen v. Embassy of The Arab Republic of Egypt, 625 Fed. App'x 338, 340 (9th Cir. 2015); Compania Interamericana Exp.-Imp., S.A. v. Compania Dominicana de Aviacion, 88 F.3d 948, 951 (11th Cir. 1996) (stating that, pursuant to § 1608(e), a

court had to determine whether plaintiff had "establish[ed] entitlement to relief by providing satisfactory evidence as to each element of the claims upon which relief was sought"). Some courts have more generally suggested that Section 1608(e) requires a "close look" at the plaintiff's claims. Clodfelter v. Republic of Sudan, 720 F.3d 199, 210 (4th Cir. 2013).

The "close look" approach does not necessarily "require the court to demand more or different evidence than it would ordinarily receive." Owens, 864 F.3d at 785 (quotation marks omitted). Indeed, "[i]n evaluating whether a plaintiff has established a claim or right to relief against a foreign state, the court may accept as true the plaintiff['s] uncontroverted evidence, including proof by affidavit." Saludes v. Republica de Cuba, 577 F. Supp. 2d 1243, 1246 (S.D. Fla. 2008) (quotation marks omitted). However, a court must satisfy itself that a plaintiff's claim "has some factual basis, even if she might not have prevailed in a contested proceeding." Owens, 864 F.3d at 785 (citations and quotation marks omitted).

This Court gleans two key principles from the not always consistent case law. First, a district court errs when it relies on a clearly erroneous factual finding. For example, in Vera v. Republic of Cuba, the Second Circuit held that a district court erred in adopting a state court's determination that the terrorism exception to foreign sovereign immunity applied "without independently assessing Cuba's immunity from suit." 867 F.3d at 317. The Vera court went on to conclude that if the district court had independently analyzed the plaintiff's claim despite Cuba's default, it would have determined that "the record contains no evidence that specifically links Cuba's terrorist designation to [plaintiff]'s father's death" and therefore the plaintiff had "failed to meet his burden to establish that the terrorism exception applies." Id. at 319.

Second, a court can be relatively "lenient" in assessing the evidence in support of a terrorism exception claim in the default context because "firsthand evidence and

eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." Owens, 864 F.3d at 785. In Han Kim v. Democratic People's Republic of Korea, the D.C. Circuit reversed and remanded the district court's judgment declining to enter a default judgment against North Korea for the torture and extrajudicial killing of a Christian missionary who was abducted from China by North Korean agents but whose ultimate fate was unknown. 774 F.3d at 1051. In determining that the plaintiffs had presented sufficient evidence to support their claim, the appeals court stated that evidentiary standards must necessarily be relaxed where a foreign sovereign like North Korea has "made [the victim] unavailable to testify on his own behalf, refused to appear in court and subject itself to discovery, and is known to intimidate defectors and potential witnesses." Id. at 1048. The court emphasized that because "courts have the authority—indeed, we think, the obligation—to adjust [evidentiary requirements] to . . . differing situations," and because letting North Korea off the hook would allow it to unfairly escape liability, direct evidence of the victim's torture or killing was not necessary to enter a default judgment. Id. (alteration in original) (quotation marks omitted). *However*, the Han Kim court still emphasized that the plaintiffs had presented significant circumstantial evidence that their relative had been tortured and killed, in particular, expert testimony that Christian missionaries who proselytize to defectors are routinely tortured and killed when in North Korean custody and expert testimony positing that the victim was intentionally starved to death. Id. at 1049-51.

## III.     ANALYSIS

Applying the principles outlined above, the Court must conclude that it cannot grant Sullivan the relief she seeks. At the most fundamental level, this Court does not have jurisdiction over the matter because Sullivan has not shown that the terrorism exception to foreign sovereign

immunity applies. Sullivan alleges that Cuba has committed an extrajudicial killing of her father.[13] However, she has not proffered any evidence that her father was the victim of an intentional killing by Cuba and that any such killing was committed in the absence of legal process. Even accepting as true Sullivan's uncontroverted evidence, which is mired in multiple levels of hearsay and often relies on speculation, she has shown, at best, that her father was incarcerated in Cuba after the date when Cuba was placed on the state sponsors of terrorism list.[14]

This Court disagrees with the state court's apparent legal conclusion that an indefinite detention of a person who is subsequently declared legally dead equates to an extrajudicial killing. The Court is aware of no legal support for this proposition, which would essentially abrogate the core elements of the statutory definition of "extrajudicial killing." In addition, for the same reason, this Court concludes that the state court also did not have jurisdiction when it entered the default judgment. This Court cannot give full faith and credit to a judgment that was entered in the absence of jurisdiction.[15] Nor is this Court bound by the state court's jurisdictional determination, which appears to have been based entirely on the unsupported conclusion that an indefinite detention equates to an extrajudicial killing.

---

[13] Sullivan has occasionally suggested that her father was tortured, but it is clear that the state court based its judgment on an alleged extrajudicial killing. (See Superior Court Judgment, PageID #s 21, 24, 25.) Further, Sullivan confirmed at the August 28, 2017 hearing before this Court that she is only alleging that her father was the victim of an extrajudicial killing. In any event, her father's situation does not fit any other scenario that would trigger the terrorism exception. For example, "hostage taking" is very specifically defined as the detention of a person "in order to compel a third party, namely, a State, an international governmental organization, a natural or juridical person or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage." 28 U.S.C. § 1605A(h)(2); Article I, ICATH, U.N. GAOR, Supp. No. 39, U.N. Doc. A/34/39 (1979). At least one court has determined that shooting down an airplane can constitute an extrajudicial killing, see Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1248 (S.D. Fla. 1997), but Sullivan is not alleging that her father was killed by being shot down, if that was indeed how he came into Cuban custody.

[14] The Court notes that Sullivan has satisfactorily addressed one of its initial concerns, which was that she could not invoke the terrorism exception if her father had been killed before Cuba was listed as a state sponsor of terrorism in 1982.

[15] Although the state court determined it also had jurisdiction under the Maine wrongful death statute, 18-A M.R.S.A. § 2-804, this Court need not, and does not, comment on that jurisdictional determination because the state court could not exercise jurisdiction without the presence of a jurisdictional "hook" under the Foreign Sovereign Immunities Act.

Furthermore, even if this Court had subject matter jurisdiction in this matter, Sullivan's failure to present any evidence that her father was extrajudicially killed by Cuba would mean that she has failed to "establish[] [her] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This Court recognizes that some degree of leniency in assessing evidentiary burdens is warranted in a situation, such as this one, in which a plaintiff has understandable difficulty getting information out of a secretive and hostile nation. But the Han Kim case demonstrates that, even taking this need for leniency into account, *some* evidence to support application of the terrorism exception to foreign sovereign immunity must be proffered. In Han Kim, the D.C. Circuit concluded that the plaintiffs had presented satisfactory evidence to the district court based in large part on their provision of expert testimony (1) about the specific treatment by North Korea of detainees sharing the victim's characteristics and (2) that the victim had likely starved to death and that his death "resulted from torture and malnutrition and was deliberately caused by his North Korean captors." Han Kim, 774 F.3d at 1050-51 (quotation marks omitted). Conceivably, this Court could have considered this type of evidence regarding Geoffrey Sullivan, including any evidence supporting an "extrajudicial killing by deliberate maltreatment" theory. However, unlike in Han Kim, the record before this Court lacks any evidence regarding Cuba's treatment of persons sharing Geoffrey Sullivan's characteristics; any evidence regarding conditions in Cuba's prisons, such as the Combinado del Este facility; or any evidence that Geoffrey Sullivan was deliberately subjected to poor conditions that caused his death.[16] Nor can

---

[16] The Court is not aware of any specific evidence in the record about the conditions Geoffrey Sullivan may have been subject to other than a few passing references to him being held in solitary confinement. References to him perhaps being "badly burned" (see, e.g., Hr'g Ex. 17, p. 2) could relate to injuries resulting from the initial plane crash that brought him into Cuban custody, and there is no evidence that his injuries were ignored or not properly treated by prison authorities. Sullivan does not argue that this Court is in any way bound in this matter by prior, non-judicial determinations that her father is legally dead, and, regardless, whether he is *dead* does not assist the Court in determining whether he was the victim of an *extrajudicial killing*.

this Court simply infer from his detention that Geoffrey Sullivan was killed in the absence of legal process.[17]

Alternatively, the Court is also troubled by other aspects of Sullivan's claim.[18]  For example, courts have suggested that a person need not be a victim's legal representative in order to bring a claim under the terrorism exception.  See Owens, 864 F.3d at 807 (noting, in holding that family members of persons killed in bombings may bring suit under the FSIA terrorism exception, that "by its plain text, the [exception] grants a court jurisdiction to hear a claim brought by a third-party claimant who is not the legal representative of a victim physically injured by a terrorist attack").  However, this Court is troubled that the state court awarded damages "owed to the Estate of Geoffrey Francis Sullivan" with the understanding that Sherry Sullivan was or would be "duly appointed as the successor to, heir to and guardian of her father's estate" (Superior Court Judgment, PageID #s 26-27), but that she essentially concedes to this Court that she has never been so appointed, see Post-[Damages] Hearing Memorandum (ECF No. 20), PageID #s 91-92.[19]  In addition, it is troubling that Sullivan wants this Court to accept that her father was living into the 1990s for purposes of enforcing the state court judgment but testified that she has benefited from a Social Security Administration determination that he died in 1963.

---

[17] In this regard, the Court notes that Geoffrey Sullivan may have been detained while committing or attempting to commit what may be crimes against a sovereign nation under international law.  See Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note) ("extrajudicial killing" does not encompass a killing "that, under international law, is lawfully carried out under the authority of a foreign nation").

[18] The Court considers any issue with the statutory limitations period or arbitration provision in Section 1605A to have been forfeited by Cuba's default.  See Worley, 75 F. Supp. 3d at 331 (determining that the terrorism exception's limitations period is non-jurisdictional and therefore can be waived or forfeited if not raised by the defendant).  The Court also does not discern any problem with service of process on Cuba.  Because this Court does not have jurisdiction in this matter, it need not, and does not, address the amount or scope of damages awarded to Sullivan in the state court judgment.

[19] The Court notes that counsel for Sullivan represented to the Court at the August 28, 2017 hearing that Attorney Oldaker, who testified at the hearing, is currently of counsel to Geoffrey Sullivan's estate in a parallel matter.

## IV.    CONCLUSION

As the First Circuit recently reiterated, "[i]n the absence of jurisdiction, a court is powerless to act," even if it is "prompted by the best of intentions."  <u>United States v. Mercado-Flores</u>, No. 15-1859, 2017 WL 4216431, at *2, 5 (1st Cir. Sept. 22, 2017) (quotation marks omitted).  Although the Court is sympathetic to Sullivan and understanding of her pain and loss, it has not been presented with satisfactory evidence that it has jurisdiction or a sufficient basis to grant her the relief she seeks.  Therefore, the Motion for Default Judgment (ECF No. 13) is DENIED and the case is DISMISSED for lack of jurisdiction.

SO ORDERED.

<u>/s/ George Z. Singal</u>
United States District Judge

Dated this 2nd day of October, 2017.